COOPER v. THE GREAT FALLS COTTON CO.

(*Nashville.*    March 27, 1895.)

1. ADVERSE POSSESSION.   *As between tenants in common.*

Possession of land by one tenant in common operates against his cotenants where it is intended or understood by all the parties to be adverse.   (*Post, pp. 590, 591.*)

2. SAME.   *Possessor making improvements.*

The possessor of land, who, with notice of an adverse claim, makes expensive improvements thereon, cannot, on that account, defeat the ejectment suit of the adverse claimants. (*Post, p. 591.*)

3. SAME.   *Connecting possessions.*

Connected adverse possessions of land, held pending suit to foreclose mortgage thereon successively, by the purchaser at the original sale in such suit, and by his vendee under title bond, and by the purchaser at a second sale made for the purchase price, are all held under and inure to the benefit of the mortgagor's title or color of title.   (*Post, pp. 594–599.*)

Case cited and distinguished: Ellege v. Cook, 5 Lea, 622.

4. SAME.   *By erection and operation of mill.*

The owner of a water mill situated on a stream acquires, by occupation and operation of the mill, actual adverse possession not only of the mill buildings and wheel pit, but of the bed of the stream to its thread between such points above and below the mill as will afford the free and unobstructed use of the water in the operation of the mill.   (*Post, pp. 599–601.*)

Case cited: Waddle v. Stuart, 4 Sneed, 534.

---

FROM WARREN.

---

Appeal from Chancery Court of Warren County. WALTER S. BEARDEN, Ch.

SMITH & SONS, W. T. MURRAY, T. C. LIND, and L. D. HILL for Cooper.

F. M. SMITH and PITTS & MEEKS for The Great Falls Cotton Mills Co.

SNODGRASS, Ch. J.    The original bill in this case was filed September 21, 1892, by William Cooper, W. B. Hill, and C. P. Hill, against Jesse and H. L. Walling and W. P. Faulkner.    It was an ejectment bill, and set up title to certain real estate on, or adjacent to, the Great Falls of the Caney Fork River, the strip immediately in controversy being a small space on the southern side of the river, and being included in a grant for twenty acres issued to John Halterman in 1822.    The defendants, Walling and Faulkner, filed an answer disclaiming title to any portion of the land, and showing that it was now the property of the Great Falls Cotton Mills Company.·

Thereupon complainant filed an amended bill November 22, 1892, making this corporation defendant, and asserting the same right as against it.    The corporation's answer denied that complainant had any title to the land, or any good and valid title as against it, or by adverse possession, or otherwise. Both complainant and defendant averred superior title, both by reason of their title papers and by adverse possession, which each asserted they had had for more than seven and for more than twenty years.    This answer of the defendant company set up that Asa

Faulkner made a wheel pit in the water at the Great Falls; that he put in a saw and a grist mill, and operated the same in his lifetime and before he conveyed the property. In 1885 he conveyed it in trust. The trustee resigned, and the land was brought to sale and sold by J. C. Biles, special commissioner, to Jesse Walling and W. P. Faulkner. Walling sold his interest to W. P. Faulkner on April 30, 1892, and Faulkner, on May 6, 1892, sold to the Great Falls Cotton Mills Company.

The statement we have made presents a brief summary of the issue involved. Many questions were asserted and attempted to be made in proof which may be eliminated by brief statement of the results as to them, without extending the discussion or elaborating. Neither party connected with any grant, nor did the possession of complainants, and Bosson, through whom they claimed, which it was insisted by defendant was by permission of defendant's vendors, appear to be such on the weight of the evidence, and, therefore, what possession complainants and their vendors have held will be treated, without more, as being adverse. In the same connection complainants insist that the possession of Asa Faulkner was not adverse to them, because he had bought an interest of one of their vendors, and for some time had held as tenant in common, and consequently his holding had not been adverse. We determine as a fact that Faulkner's holding was adverse. He had bought the land in conflict with a

view to protect himself against litigation, and complainants and their vendors did not understand, nor did he, that his holding on the Warren County side of the river was for both, but, on the contrary, each knew that the claim of the other was adverse.

Another question raised is that complainants are estopped to seek to recover this land, because of the fact that expensive improvements had been made by defendant, Faulkner, and with full knowledge of complainants, who did not assert an adverse claim. There is nothing in this defense. As above stated, in respect to the adverse claim of the complainants that defendant was a tenant in common and holding as such, the claims of each were well known to the other, and whatever was done as to improvements was done with the full knowledge of the adverse claim of the complainants, and in the expectation that it would be asserted, as it has been. The claims of each will, therefore, stand upon the merits of the respective titles. Of course it is proper to observe, in this connection, that complainants, if entitled to recover anything, can recover only upon the strength of their own title, and must, therefore, make out a title for themselves. This they have done by showing color of title in themselves and vendors, with seven years adverse possession of a portion of the twenty acres in controversy, and that this was granted land. Bosson, who bought the Halterman land (though the record does not show any connection through and with the Halterman title),

built a dam across the river to the southern bank, sometime about 1843 or 1844. This was maintained for more than seven years—indeed, for more than twenty years. Nothing else occurring, that would have vested title in complainants, and to the full extent of the land described in the Halterman grant. But defendant, and those under whom it claims, had possession on other parts of the land in controversy so as to neutralize the effect of the Bosson possession of the land, and to confine it to that part of the land embraced in the Bosson title actually taken possession of by Bosson, or which can be assumed to have been so possessed by the building and maintaining of a dam across the river as indicated. It may be considered as satisfactorily established, at least settled by the weight of the evidence, that their seven years possession with color of title vested in complainants' vendors title to so much of the land as is now occupied by the wheel pit and race of defendant, prior to the purchases of Asa Faulkner from Cunningham in September and October, 1881.

The material inquiry, therefore, is as to the effect of Faulkner's possession, and those claiming under him since that date, including defendant; for we think, notwithstanding all objections of complainants, it is one continuous possession up to the date of the filing of this bill in 1892. This has been sufficient to vest in defendant title to its building and wheel pit. Whether it extends to the water privi-

lege and so much of the thread of the stream as decreed by the Chancellor, is another question, and remains to be examined in the light of the evidence.

The Chancellor's decree, as we understand it, was on this theory. He decreed as follows, illustrating by the appended diagram:

That complainants were entitled to recover to the southern end of the dam (marked "D" on the diagram) and southeast with the line of the river to point "P" on the diagram; thence west of the wheel pit diagonally northeast and crossing the river, as indicated by the line "P A."

The Chancellor does not give his reasons, and counsel profess themselves to be much at a loss to

divine any, for what each (for both appeal) term this arbitrary and compromise line. But evidently the Chancellor treated complainants' adverse claim and possession under color of title prior to 1881, when Faulkner bought of Cunningham, as having ripened into a perfect title to the southern line on, beyond, or east of the wheel pit, but that Faulkner's possession since that date had been a conflict not only as to the actual wheel pit, but as to the race and necessary flow of water thereto and therefrom, and treated defendant's possession, to that extent, as adverse since said purchase, and that therefore defendant had, under its color of title and such possession, regained of complainants so much of the Halterman land and water as was included in said area, and no more, treating that area as the real possession of Faulkner and the real conflict, which would occasion a divestiture of so much of this land and water out of complainants by virtue of the operation of the statute of limitations, a nowise arbitrary or compromise conclusion, nor one, we think, difficult to comprehend, whatever may be said of its correctness, about which we will inquire later on.

We have already held that it is correct so far as the wheel pit and land occupied by the improvements are concerned. Is it so as to the water above the wheel pit, and to the thread of the stream, the extent of defendants claim?

There are several questions raised which are nec-

essary to be determined in order to adjudge the
effect of the holding by defendant and those through
whom it claims.    It is insisted by complainants that
there "has been no seven years continuous possession
of any part of the land in controversy, because of
the fact that Faulkner's possession, such as it was,
was broken under these conditions: Faulkner made
a deed of trust to the property in 1885 to Jesse
Walling, as trustee, to secure the payment of cer-
tain debts.    Bills were filed in the Chancery Court
of Warren County to sell it.    Pending these pro-
ceedings, Walling resigned, and J. C. Biles was
substituted in his stead, and as receiver, to sell the
property.    It was sold by him, and purchased by two
of the sons of Faulkner—Clay and Thomas Faulk-
ner.    They sold the property to Moore, Wilder, and
McWhirter, giving these parties a title bond, and
they assumed, among other things, to pay off the
Faulkner notes for the purchase price given to Biles
as receiver, and take deeds from him.    Moore,
Wilder, and McWhirter took possession, and held the
property for a year or more, when they failed to
pay for it, as did also their vendors, and the land
was resold by decree of the Chancery Court to en-
force the lien which had been retained for the pur-
chase money.    Moore, Wilder, and McWhirter, how-
ever, were not, by any kind of pleading, made
parties to the proceeding for this purpose; but this
sale was had in the original case in which the prop-
erty was first sold, and to enforce the lien retained

in that case. At this last sale W.. P. Faulkner and Jesse Walling became the purchasers. Jesse Walling sold his interest to W. P. Faulkner, and Faulkner sold to the present defendant, The Great Falls Cotton Mills Company.

Complainants make several questions regarding this proceeding, which they insist are fatal to defendant's claim of continuous possession through itself and vendors. They say, first, that the land sold to Clay and Thomas Faulkner, and by Clay and Thomas Faulkner to Moore, Wilder, and McWhirter, was only the one hundred and fifty acre tract (the second purchase of Faulkner from Cunningham), and that this tract did not include the wheel pit, race, and so much of the river as was used by the several parties named, and as is now used by defendant; and, second, that the possession of Moore, Wilder, and McWhirter, was an independent possession for themselves, and cannot be connected with the prior possession of Faulkner, so as to make out the bar of the statute of limitations of seven years, under the case of *Ellege* v. *Cook*, 5 Lea, 622.

Respecting the first of these two propositions, we find the fact to be, that while there were terms employed in the decree, and in the title bond, indicating such a limitation of the property sold as that for which complainants contend, yet, taken altogether, they show that the sales were made under the decree, and by Clay and Thomas Faulkner, intending to pass the whole property, and there were terms employed

sufficient to include the whole property, and carry out the manifest intent of all the parties, which was to sell on the one side and purchase on the other the manufacturing site and water power together, and the purchasers assumed to pay the Faulkner notes, and take title from Biles, receiver, as the Faulkners, their vendors, were to do. It is not necessary that this decree and bond should be copied and analyzed to show the correctness of this result. We are satisfied so to decide it without quotation or further elaboration.

As to the second proposition advanced by the complainants, that the possession of Moore, Wilder, and McWhirter could not be considered as under the Faulkner title, or to make out the seven years possession claimed to have been held by defendant, we hold it is not well taken. The property, as already stated, was brought to sale in the Chancery Court under bills filed for that purpose, lien being retained to secure the purchase money. While the case was still pending, and while the first vendees had not complied with the terms of the sale, by payment, so as to extinguish the lien, these vendees themselves, and those put in possession by them, under title bond, continued to hold possession of the property. The case still pending in the Chancery Court for the enforcement of the lien, it was enforced, a resale made to Walling and Faulkner, and the property subsequently paid for and the lien extinguished. All this was but in effectuation of the original proceeding to

sell. The purchasers, original and subsequent, came in under this proceeding, and in subordination to the Faulkner title, and subject to the orders and decrees of the Court to perfect a sale by the collection of the purchase money and discharge of the lien. Their holdings, therefore, were not adverse to the Faulkner title, but strictly as claimants thereunder. In such case as is presented in this record, upon the facts stated, the holding must be treated to be under the title through which they were holding. The case of *Ellege* v. *Cook*, is not in contravention of this theory. Whether that case was right upon its own facts, we do not deem it necessary to express, at this time, any opinion. Certain it is, that it will not be extended to any case not strictly within it.

A different holding to that now made in this case would establish the proposition, that if A file a bill against B to foreclose a mortgage, or enforce a lien on B's property, and obtain a decree for that purpose, and the property be sold and put in the possession of a purchaser, a lien being retained to secure the payment of the purchase money, and the purchaser fails to pay it, should A proceed, in the same case, to enforce the lien retained and resell the property, the holding of the purchaser during the suit would have to be held, not under the title they purchased, but adverse thereto, or especially so if the purchaser who bought at the sale should, pending the case, resell to another (who would, of course, come in in subordination to the lien, and from whom the

property would be taken by the enforcement of the lien retained in the case). Such a doctrine would be ruinous to litigants occupying the relation stated, is wholly unreasonable, and cannot prevail in this State. It does not in any other, so far as we are advised.

Another insistence of complainants is that, granting the defendant's and its vendors' possession to have been continuous, and their claim to have been under both the Faulkner deeds (the first deed making a ribbon strip from the thread of the stream to low water mark, and the second conveying 150 acres on the south side of the stream up to low water mark), then they say that the defendant's possession could only operate to retake from complainants the wheel pit actually occupied by defendant and its predecessors in title. Their second theory in advocacy of that proposition (the first being that the Bosson title, by virtue of seven years possession after 1843, had ripened into a perfect title to the full extent of the twenty (20) acre boundary of the Halterman grant) is that when Faulkner entered into possession under his deeds from Cunningham, which covered a part of the land actually occupied by the Bosson dam, that his possession would only inure to his benefit, to reclaim from the Bosson title so much of the twenty (20) acres (so much of the bank of the stream and the stream itself) as Faulkner and his vendees actually occupied, under the case of *Waddle* v. *Stuart*, 4 Sneed, 534.

The complainants insist that Faulkner and his

vendees can only be held to have actually occupied the space of ground used for their wheel pit, and cannot be held to have had any occupancy or possession of so much of the water as flowed over the wheel used in the pit, or of any portion of the river bed over which the water was thus made to flow. In this complainants are in error. Faulkner's possession of the water flowing over the wheel was all he needed, and practically all that he could take. He made an excavation in the river, forming a kind of race, and turned the flow of the water over his wheel. In this form its use was continued for the full period of seven years, and he, and those holding under him, must be held to have acquired the same right to the land, and water flowing over it to the thread of the stream above the wheel pit, as they acquired to the wheel pit itself.

The Chancellor's decree was erroneous in holding that complainants did not have the right to recover the remainder of the land in controversy from the abutment of their dam on the south bank, east with low water mark to a point west of the wheel pit, where the flow of the water will not be impeded; north to the center of the stream; thence east with the center of the stream to the east line of the Halterman grant, and around with said line to the beginning.

Defendant, in fact, in open Court, when the final decree was rendered, disclaimed title north of the thread of the stream, and it does so now, and in-

sists, for that reason, that it should not have been taxed with any part of the cost, as was done by the Chancellor. As a matter of right, however, without regard to this disclaimer, the complainants were and are entitled to recover the land in controversy, north of the thread of the stream and west of the Halterman east line, which was not given them by the Chancellor, nor is defendant entitled to avoid any cost on account of such disclaimer. That result only follows where a complainant's right to recover is defeated by a disclaimer in the pleadings.

Complainants, therefore, had the right to recover this much of the land in addition to that which the Chancellor gave them, and they are entitled to full cost. The Chancellor's decree, therefore, is so modified, and decree will be entered here in accordance with this opinion. The defendant will pay the cost of both Courts.